**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:22-cv-22307-BB**

MARIA FERNANDA SOTO LEIGUE,
individually and on behalf of all
others similarly situated,                                    **CLASS ACTION**

      Plaintiff,                                              **JURY TRIAL DEMANDED**

v.

EVERGLADES COLLEGE, INC. d/b/a
KEISER UNIVERSITY,

      Defendant.
_____/

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Maria Fernanda Soto Leigue brings this class action against Defendant Everglades College, Inc. d/b/a Keiser University, and alleges as follows upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys.

## NATURE OF THE ACTION

1.      This is a putative class action pursuant to the Florida Telephone Solicitation Act ("FTSA"), Fla. Stat. § 501.059.

2.      Defendant is a private university that provides educational services.

3.      Defendant charges consumers a tuition for its educational services.

4.      To promote its services, Defendant engages in unsolicited text messaging.

5.      Defendant's telephonic sales calls have caused Plaintiff and the Class members harm, including violations of their statutory rights, statutory damages, annoyance, nuisance, and invasion of their privacy.

6.      Through this action, Plaintiff seeks an injunction and statutory damages on behalf of herself and the Class members, as defined below, and any other available legal or equitable remedies resulting from the unlawful actions of Defendant.

## PARTIES

7.      Plaintiff is, and at all times relevant hereto was, an individual and a "called party" as defined by Fla. Stat. § 501.059(1)(a) in that she was the regular user of telephone number \*\*\*-\*\*\*-1578 (the "1578 Number") that received Defendant's telephonic sales text messages. Plaintiff is a resident of Miami-Dade County, Florida.

8.      Defendant is, and at all times relevant hereto was, a Florida corporation and a "telephone solicitor" as defined by Fla. Stat. § 501.059(f).  Defendant maintains its primary place of business and headquarters in Fort Lauderdale, Florida. Defendant directs, markets, and provides business activities throughout the State of Florida and the United States.

## JURISDICTION AND VENUE

9.      This action is within the original jurisdiction of this Court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), which grants district courts original jurisdiction over class actions in which the amount in controversy exceeds $5,000,000 and any member of the class of plaintiffs is a citizen of a State different from any defendant. As set forth by Defendant in its Notice of Removal, this action satisfies each of the requirements of § 1332(d)(2) for original jurisdiction under CAFA the required diversity of citizenship under CAFA

is satisfied because "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A). *See* Notice of Removal, DE 1.

10.     Defendant is subject to general personal jurisdiction in Florida because it is incorporated in Florida, and its principal place of business is in Florida.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendant is deemed to reside in any judicial district in which it is subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## **FACTS**

### **Defendant's Background and Business Model**

12.     Defendant is a purported nonprofit university with over 20,000 students, 66,000 alumni, and 3,800 employees across dozens of campuses.

13.     Compared to its public non-profit counterparts, it is significantly more expensive to obtain a degree at Defendant's institution. A degree in Business Administration costs approximately $60,000 at Defendant's university, while a Bachelor's degree in Business Administration at the University of Florida costs approximately $29,000.

14.     Despite claiming to be a nonprofit organization, a recent letter to General Counsel of the U.S. Department of Education by three members of Congress tells a different story:

> [Dr. Keiser's] 2011 Keiser University-Everglades College conversion was (and continues to be) a prime example of a so-called "covert for-profit." The nonprofit Everglades College—which Keiser led—agreed to pay $521 million to acquire Keiser's own for-profit Keiser University. In the first year following the conversion, Dr. Keiser and his family members received payments totaling $34 million from the "nonprofit" college. A Government Accountability Office (GAO) report from April 2021, requested by Senator Durbin, highlighted this conversion among other problematic examples requiring additional scrutiny and protections.

*See* correspondence dated February 18, 2022, attached as **Exhibit A**.

15.     Separately, a United States Senate study found that on average, approximately 60% of Defendant's students withdraw after a period of seven months at Defendant's institution. *See* www.help.senate.gov/imo/media/for_profit_report/PartII/Keiser.pdf.

16.     That same study concluded:

> Given the high cost of tuition at Keiser and that the majority of students leave the company's schools with no degree or diploma, the company's high rate of student loan default is particularly troubling. It is unclear whether taxpayers or students are obtaining value from their investments in the company. Moreover, Keiser's decision to convert to non-profit status should be more closely scrutinized.

*Id.*

17.     As noted by the Senate study, almost of all Defendant's students pay for their tuition through some form of federal and private student loans. Accordingly, Defendant derives almost all of its revenue from federal and private lenders.

18.     Due to its high turnover – which ranks in the top ten for the private university sector – Defendant is forced to implement aggressive marketing strategies to recruit new students so it can ultimately generate revenue (which is then utilized to pay back the loan issued by Dr. Keiser and his family members).

19.     Defendant's annual advertising budget alone is over $50 million.

20.     Defendant advertises its services by utilizing Gragg Advertising, "a full service direct response agency that creates, implements, and manages integrated campaigns for both digital and traditional mediums." *See* graggadv.com/about-us/.

21.     Defendant also utilizes a high-pressure call-center with daily calling quotas that has no shortage of on-line complaints by former employees, including the following:

- Call center environment, sales driven, weekends and late nights

- Admissions is run like a high pressure call center. You must call at least 80-100 people a day. It doesn't matter if the people in the past have said they're not interested because they might change their mind. What you learn at training is not what is practiced. The official phrase is 'policy vs practice.' The deans don't like to deal with students. Students are constantly dropping out and admissions make bets on how long they will last when they enroll them. Their phrase is students first, but it's really about the numbers and how many you can enroll. There is a lot of competition between the different campuses. It is a big deal when another campus 'steals students' and there is no teamwork.

- Management would rather use scare tactics and emotional abuse than lead with anything silly like encouragement or motivation. Work like a slave, never question anyone's decision, and be micromanaged like you're an idiot (took a 16 min break instead of a 15 min break? You're getting a write up). Please don't mistake this for bitterness. This is truth. I work her because I have people to support and just haven't found a better job yet. There's this lovely culture of back-stabbing in this high-pressure, call center-like job.

- Didn't take long to see the 'Keiser Way' is about numbers-Enrollments/Starts. I get that, but the stress of the goals is a bit much. The premise is good, but overpriced. They would get more students into their other programs (besides nursing, radiology) and fill them, if they brought the tuition down. The lack of PTO the 1st year (1wk) They make your schedule & don't like to change it It really is a 'call center' in Admissions & they don't like you to spend to much time with a student if they aren't going to make an appt. w/in the next 3 days

- Call center, Broken process, phone harassment, expensive, bullpen mentality, schedule, unrealistic goals, SALES!! No commission, work life balance (no day off in summer)

www.glassdoor.com/Reviews/Keiser-University-call-center-Reviews

EI_IE346101.0,17_KH18,29.htm

22.     Internally and in communications with this advertising agency, Defendant refers to prospective students as how it sees them: "leads".

**Defendant Harasses Consumers with Telephonic Sales Calls**

23.     On or about January 2, 2020, submitted a simple inquiry for information to Defendant through a form on its website.

24.     When she submitted her information, Plaintiff did not consent to receive automated text message solicitations on her cellular phone, and Defendant failed to secure Plaintiff's express written consent for any such telemarketing.

25.     Consistent with aggressive telemarketing practices discussed above, employees from Defendant's call center called Plaintiff eleven (11) times between January 2, 2020 and January 13, 2020, and sent solicitation emails to Plaintiff on January 2, 2020, January 4, 2020, July 10, 2020, August 14, 2020, August 20, 2020, August 25, 2020, September 1, 2020, September 8, 2020, September 14, 2020, September 21, 2020, October 15, 2020, November 27, 2020, December 14, 2020, December 28, 2020, December 31, 2020, March 25, 2021, March 29, 2021, April 10, 2021, and August 6, 2021.

26.     In addition to the calls, Defendant sent or attempted to send text message solicitations to Plaintiff's cellular telephone on February 11, 2020, July 10, 2020, July 14, 2020, August 1, 2020, October 15, 2020, October 30, 2020, November 16, 2020, November 27, 2020, December 28, 2020 (twice), March 25, 2021, April 10, 2021, August 6, 2021 (twice), August 10, 2021, August 14, 2021, August 17, 2021, and September 23, 2021.

27.     The following screenshots depict just some of the messages Plaintiff received:



28.    Notably, Defendant's messages did not include instructions on how to opt-out of future messages.

29.    On September 23, 2021, Plaintiff responded with the words "Please remove me from your contact list," in an attempt to opt-out of any further text message communications with Defendant:



30.   Despite Plaintiff's use of clear opt-out language, Defendant ignored Plaintiff's opt-out demand and continued to send or attempt to send Plaintiff promotional text messages, including on October 6, 2021, October 12, 2021, December 6, 2021, and December 17, 2021.

31.   As demonstrated by the above screenshots, the purpose of Defendant's telephonic sales messages was to solicit the sale of consumer services.

32.   Defendant's text messages constitute telephonic sales calls because they encouraged the future sale of consumers services, i.e., selling Plaintiff educational services in the form of university courses for which Plaintiff would have paid out-of-pocket and/or through student loans. Moreover, Plaintiff would have purchased such services for personal purposes only.

8

33.     Defendant's text messages also constitute telephonic sales calls because the purpose was to obtain information that would be used by Defendant to directly solicit the sale of consumer educational services that Plaintiff would have purchased out-of-pocket and/or through student loans, and for personal purposes only.

34.     Defendant's texts were not made for an emergency purpose or to collect a debt.

35.     Plaintiff is the regular user of the telephone number that received the above telephonic sales calls.

36.     Upon information and belief, Defendant maintains and/or has access to outbound transmission reports for all text messages sent advertising/promoting its services and goods. These reports show the dates, times, target telephone numbers, and content of each message sent to Plaintiff and the Class members.

37.     As Defendant has conceded, it sent over 10,000 text message solicitations like the ones it sent to Plaintiff.

38.     The impersonal and generic nature of Defendant's text messages, coupled with their frequency, demonstrates that Defendant utilized a computer software system that automatically selected and dialed Plaintiff's and the Class members' telephone numbers.

39.     To send the text message, Defendant used a messaging platform (the "Platform"), which permitted Defendant to transmit thousands of text messages automatically and without any human involvement.

40.     Defendant was not required to and did not need to utilize the Platform to send messages to Plaintiff and the Class members. Instead, Defendant opted to use the Platform to maximize the reach of its text message advertisements at a nominal cost to Defendant.

41.     The Platform has the capacity to select and dial numbers automatically from a list of numbers.

42.     The Platform has the capacity to schedule the time and date for future transmission of text messages.

43.     The Platform also has an auto-reply function that results in the automatic transmission of text messages.

44.     Defendant was not required to and did not need to utilize the Platform to send messages to Plaintiff and the Class members. Instead, Defendant opted to use the Platform to maximize the reach of its text message advertisements at a nominal cost to Defendant.

45.     Defendant would be able to conduct its business operations without sending automated text messages to consumers.

46.     Defendant would be able to send automated text messages to consumers, and in compliance with the FTSA, by securing the proper consent from consumers prior to sending text messages.

47.     Defendant would be able to send text messages to consumers without consent by utilizing a non-automated text messaging system.

48.     Accordingly, it is not impossible for Defendant to comply with the FTSA in the context of transmitting text messages.

49.     The burden and cost to Defendant of securing consent from consumers that complies with the FTSA is nominal.

50.     Compliance with the FTSA will not result in Defendant having to cease its business operations.

51.     Compliance with the FTSA will not result in Defendant having the alter the prices of any goods or services it provides in the marketplace.

52.     Compliance with the FTSA will not force Defendant to seek regulatory approval from the State of Florida before undertaking any type of commercial transaction.

53.     Because a substantial part of Defendant's FTSA violations occurred in Florida, requiring Defendant's compliance with the FTSA will not have the practical effect of regulating commerce occurring wholly outside of Florida.

54.     Plaintiff never provided Defendant with express written consent authorizing Defendant to transmit telephonic sales calls to Plaintiff's cellular telephone number utilizing an automated system for the selection or dialing of telephone numbers.

55.     More specifically, Plaintiff never signed any type of authorization permitting or allowing the placement of a telephonic sales call by text message using an automated system for the selection or dialing of telephone numbers.

56.     The form utilized by Defendant to acquire Plaintiff's and the Class members telephone numbers is depicted below:



57.    As demonstrated by the above, Defendant's form fails to comply with the FTSA's "express written consent" requirements in the following ways:

(a) The disclosure language is not clear and conspicuous, but is instead concealed in small font below a large yellow "REQUEST INFO" call to action button;

(b) The disclosure language fails to state that the consumer is agreeing to receive telephonic sales calls; and

(c) The disclosure language fails to advise consumers that they are not required to directly or indirectly sign the written agreement or to agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

58.    Since Plaintiff's prior lawsuit, Defendant has conceded that its prior form was deficient by attempting to remedy some of the deficiencies in the disclosure language:

12



59.     As reflected by the above, Defendant's new disclosure language makes reference to "marketing" and that consumers are "not required to provide my phone number as a condition of purchasing any property, goods, or service." In other words, Defendant itself concedes that its call-center's solicitations are to market its services.

60.     Defendant's telephonic sales calls caused Plaintiff and the Class members harm, including statutory damages, inconvenience, invasion of privacy, aggravation, annoyance, and violation of their statutory privacy rights.

## CLASS ALLEGATIONS

### PROPOSED CLASSES

61.     Plaintiff brings this lawsuit as a class action on behalf of herself individually and on behalf of all other similarly situated persons as a class action pursuant to Federal Rule of Civil Procedure 23. The Classes that Plaintiff seeks to represent are defined as:

**FTSA Class**: **All persons within the United States who, (1) were sent more than one telephonic sales call regarding Defendant's property, goods, and/or services, (2) using the same equipment or type of equipment utilized to call Plaintiff.**

**Internal Do Not Call Class: All persons within the United States who, within the four years prior to the filing of this Complaint, were sent more than one text message from Defendant or anyone on Defendant's behalf, to said person's cellular telephone number *after* making a request to Defendant to not receive future text messages.**

62.     Defendant and its employees or agents are excluded from the Classes.

**NUMEROSITY**

63.     Defendant has placed telephonic sales calls to telephone numbers belonging to at least 10,001 consumers. The members of the Classes, therefore, are believed to be so numerous that joinder of all members is impracticable.

64.     Identification of the Class members is a matter capable of ministerial determination from Defendant's call records.

**COMMON QUESTIONS OF LAW AND FACT**

65.     There are numerous questions of law and fact common to the Classes which predominate over any questions affecting only individual members of the Classes. Among the questions of law and fact common to the Classes are:

(a) Whether Defendant initiated telephonic sales calls to Plaintiff and the Class members;

(b) Whether Defendant can meet its burden of showing that it had prior express written consent to make such calls;

(c) Whether Defendant sent solicitations to individuals who had requested not to receive calls; and

(d) Whether Defendant is liable for damages, and the amount of such damages.

66.     The common questions in this case are capable of having common answers, and Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

### TYPICALITY

67.     Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories.

### PROTECTING THE INTERESTS OF THE CLASS MEMBERS

68.     Plaintiff is a representative who will fully and adequately assert and protect the interests of the Classes and has retained competent counsel. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Class.

### SUPERIORITY

69.     A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Classes is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Classes are in the millions of dollars, the individual damages incurred by each member of the Classes resulting from Defendant's wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Classes could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

70.     The prosecution of separate actions by members of the Classes would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another

may not. Additionally, individual actions may be dispositive of the interests of the Classes, although certain class members are not parties to such actions.

**COUNT I**
**Violation of Fla. Stat. § 501.059**
**(On Behalf of Plaintiff and the FTSA Class)**

71.      Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

72.      It is a violation of the FTSA to "make or knowingly allow a telephonic sales call to be made if such call involves an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called without the prior express written consent of the called party."  Fla. Stat. § 501.059(8)(a).

73.      A "telephonic sales call" is defined as a "telephone call, text message, or voicemail transmission to a consumer for the purpose of soliciting a sale of any consumer goods or services, soliciting an extension of credit for consumer goods or services, or obtaining information that will or may be used for the direct solicitation of a sale of consumer goods or services or an extension of credit for such purposes."  Fla. Stat. § 501.059(1)(i).

74.      "Prior express written consent" means an agreement in writing that:

1.  Bears the signature of the called party;

2.  Clearly authorizes the person making or allowing the placement of a telephonic sales call by telephone call, text message, or voicemail transmission to deliver or cause to be delivered to the called party a telephonic sales call using an automated system for the selection or dialing of telephone numbers, the playing of a recorded message when a connection is completed to a number called, or the transmission of a prerecorded voicemail;

3.  Includes the telephone number to which the signatory authorizes a telephonic sales call to be delivered; and

4.  Includes a clear and conspicuous disclosure informing the called party that:

16

      a. By executing the agreement, the called party authorizes the person making or allowing the placement of a telephonic sales call to deliver or cause to be delivered a telephonic sales call to the called party using an automated system for the selection or dialing of telephone numbers or the playing of a recorded message when a connection is completed to a number called; and

      b. He or she is not required to directly or indirectly sign the written agreement or to agree to enter into such an agreement as a condition of purchasing any property, goods, or services.

Fla. Stat. § 501.059(1)(g).

75.     Defendant failed to secure prior express written consent from Plaintiff and the FTSA Class members.

76.     In violation of the FTSA, Defendant made and/or knowingly allowed telephonic sales calls to be made to Plaintiff and the FTSA Class members without Plaintiff's and the FTSA Class members' prior express written consent.

77.     Defendant made and/or knowingly allowed the telephonic sales calls to Plaintiff and the FTSA Class members to be made utilizing an automated system for the selection or dialing of telephone numbers.

78.     As a result of Defendant's conduct, and pursuant to § 501.059(10)(a) of the FTSA, Plaintiff and FTSA Class members were harmed and are each entitled to a minimum of $500.00 in damages for each violation.

79.     Plaintiff requests for this Court to enter an Order granting the relief outlined in the Prayer for Relief below.

**COUNT II**
**Violation of Fla. Stat. § 501.059**
**(On Behalf of Plaintiff and the Internal Do Not Call Class)**

80.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

81.     It is a violation of the FTSA to initiate an outbound telephone call, text message, or voicemail transmission to a consumer, business, or donor or potential donor who has previously communicated to the telephone solicitor or other person that he or she does not wish to receive an outbound call, text message, or voicemail transmission:

    (a) Made by or on behalf of the seller whose goods or services are being offered; or

    (b) Made on behalf of a charitable organization for which a charitable contribution is being solicited.

Fla. Stat. § 501.059(5) (a), (b).

82.     Plaintiff and the Class Members made requests to Defendant not to receive messages from Defendant.

83.     Defendant failed to honor Plaintiff and the Internal Do Not Call Class members' requests.

84.     In violation of the FTSA, Defendant made and/or knowingly allowed outbound text messages offering their services to be sent to Plaintiff and the Class members, after they had previously communicated to Defendant that he or she did not wish to receive any more calls, text messages, or voicemails from Defendant.

85.     As a result of Defendant's conduct, and pursuant to § 501.059(10)(a) of the FTSA, Plaintiff and Class members were harmed and are each entitled to a minimum of $500.00 in

damages for each violation.  Plaintiff and the Class members are also entitled to an injunction against future calls.

86.     Plaintiff and the Internal Do Not Call Class members also suffered damages in the form of invasion of privacy.

## COUNT III
### Injunctive Relief Pursuant to Fla. Stat. § 501.059(10)(a)
### (On Behalf of Plaintiff and the FTSA Class)

87.     Plaintiff re-alleges and incorporates the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

88.     Pursuant to section 501.059(10)(a), Plaintiff seeks injunctive relief prohibiting Defendant's unlawful conduct in the future to protect Plaintiff and the FTSA Class members from Defendant's unsolicited calls and practices.

89.     Defendant's ongoing and continuing violations have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and the FTSA Class members.

90.     Plaintiff and the FTSA Class members suffer irreparable harm if Defendant is permitted to continue its practice of violating the FTSA.

91.     The injuries that the Plaintiff and the FTSA Class members will suffer if Defendant is not prohibited from continuing to engage in the unlawful practices described herein far outweigh the harm that Defendant will suffer if it is enjoined from continuing this conduct.

92.     The public interest will be served by an injunction prohibiting Defendant from continuing to engage in the unlawful practices described herein.

93.     Accordingly, Plaintiff and the FTSA Class members seek an injunction requiring Defendant to implement policies and procedures to secure express written consent before engaging in any text message solicitations, and to follow such consent requirements.

94.     Plaintiff requests for this Court to enter an Order granting the relief outlined in the Prayer for Relief below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Classes, prays for the following relief:

a)  An order certifying this case as a class action on behalf of the Classes as defined above, and appointing Plaintiff as the representative of the Classes and Plaintiff's counsel as Class Counsel;

b)  An award of statutory damages for Plaintiff and each member of the Classes as applicable under the FTSA;

c)  An order declaring that Defendant's actions, as set out above, violate the FTSA;

d)  An injunction requiring Defendant to cease all telephonic sales calls made without express written consent, and to otherwise protect the interests of the Class; and

e)  Such further and other relief as the Court deems necessary.

## JURY DEMAND

Plaintiff, individually and on behalf of the Class, hereby demand a trial by jury.

DATED: August 15, 2022

Respectfully Submitted,

**HIRALDO P.A.**

*/s/ Manuel S. Hiraldo*
Manuel S. Hiraldo, Esq.
Florida Bar No. 030380
401 E. Las Olas Boulevard
Suite 1400
Ft. Lauderdale, Florida 33301
Email: mhiraldo@hiraldolaw.com
Telephone: 954.400.4713


**SHAMIS & GENTILE P.A.**

*/s/ Andrew Shamis*
Andrew J. Shamis, Esq.
Florida Bar No. 101754
ashamis@shamisgentile.com
/s/ Garrett Berg
Garrett O. Berg, Esq.
Florida Bar No. 1000427
gberg@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

**EDELSBERG LAW P.A.**

/s/ Scott Edelsberg
Scott Edelsberg, Esq.
Florida Bar No. 0100537
20900 NE 30th Ave., Suite 417
Aventura, Florida 33180
Telephone: 305-975-3320
Email: scott@edelsberglaw.com

*Counsel for Plaintiff and the Class*